Case number 23-5232, Dog Society and International Documentary Association, a balance, v. Antony J. Blinken, Secretary, United States of Department of State, and Alejandro N. Mayorkas in his official capacity as Acting Secretary of Homeland Security. Ms. DeSalle for the balance, Mr. Brewer for the appellees. Ms. DeSalle, you may proceed. Thank you, Your Honor, and may it please the Court. My name is Caroline DeSalle, and I represent the plaintiff's appellants. I'd like to reserve two minutes for rebuttals. This case concerns government regulations that burden the free expression and association of millions of people each year, all while adding no demonstrated value to achieving the government's stated aims. Normally, courts wouldn't hesitate to conclude that these kinds of regulations are arbitrary and capricious under the first amendment, under the APA, excuse me, and poorly tailored under the first amendment. Because these regulations relate to immigration, however, the district court concluded that they were effectively off-limits to judicial review. The government now doubles down on that conclusion, asking this court to hold that meaningful review of any government action that touches on immigration is foreclosed. I'd like to direct you toward the standing question, and a lot of the briefing is about injury, and maybe we can talk about that a little bit later. But I have a bigger concern about causation and redressability after Murthy. So I'll just share kind of what I'm thinking, and then you can tell me where I kind of went off the rails. But state officials, even before this rule, state department officials could already demand social media profiles on an ad hoc basis. Is that correct? Yes, your honor. So in this case, the rule requires revealing those social and that those social media profiles. So the previous kind of status quo where they could demand the profiles, that is unchallenged conduct. But the new rule is challenged. So far, so good. Yes, your honor. And then there's allegedly some self-censorship because people say, I don't want the state department if I apply for a visa to see what I was doing on social media. It's hard for me to know whether that self-censorship is caused by the unchallenged conduct or the challenged conduct, because you could imagine either of them chilling, chilling speech and causing self-censorship. And there it seems very like Murthy, because in Murthy, the social media companies had their own policies, and that was unchallenged conduct. There was allegedly government pressure on the social media companies that was challenged conduct, and there was self-censorship. And the court said, well, we can't know whether self-censorship was caused by the unchallenged conduct or the challenged conduct. So this really does seem quite analogous to Murthy. So thank you for the question, your honor. I think I have two key responses. First, there's a big difference between the mere possibility that in the context of an individual visa application, an applicant might be required to provide additional information to aid the consular officer's decision there. And the absolute guarantee under this dragnet disclosure requirement that you will be forced to disclose five years worth of social media handles that exposes many more years of social media activity to the government to then be retained in government files for 100 years after your birth and put to any number of unknown uses in the future. So the chilling effect we think is much more pronounced and universally suffered in this case by visa applicants. The second point I would raise is simply the specificity in the allegations in our complaint. We have identified a number of different plaintiffs members and partners who have said that it is specifically because of the disclosure requirement that we're challenging in this case that they have ceased to speak on social media in anticipation of applying for a new or renewed visa, for example. And so the specificity of the allegations in this complaint differ starkly from what the court reviewed in Murphy. I'm not sure. The instances in Murphy involved individuals whose names were given, the specific content that they wanted to post, the specific kind of censorship by the social media companies that had come down on them. Sometimes it was kind of, I forget all the terms, but sometimes it was just blocking them, but sometimes it was making it harder for people to view them. Here, your best, your most specific person is some guy in the Midwest. We have no idea who he is. We don't even know what state he lives in. It's just the Midwest. And we don't know if he's eligible for a visa. We don't know if he's planning to apply for a visa tomorrow or next year. This sort of has a Lujan flavor to it of like maybe sometime down the road, he'll apply for a visa. Actually, I say he, I think it's a he, but I don't remember if you even gave us the person's gender. Is it a he? We did not disclose him for reasons that I can get into. And I get that, you know, your whole case is you, they're worried. So you can't give, you can't give me, you know, name, name, rank, and serial number. I get that. But some guy in the Midwest who might one day apply for a visa, it's pretty nonspecific. So thank you, Your Honor. With regard to the specificity, the contrast that I was drawing between our complaint and the Murthy complaint, what I'm really focusing on is the specificity with regard to the challenged government action. That's what Justice Barrett and the Murthy decision found lacking in that case, a tight connection between the challenged government action and the censorship that the individuals claimed to have suffered. But moreover, in that case, the court made clear that the burden on plaintiffs increases throughout stages of the litigation. There, there was a dense evidentiary record in support of a preliminary injunction motion. Whereas here, this case is before the court on a motion to dismiss. And we think that the complaint identifies plausible allegations with the requisite specificity to survive a motion to dismiss. But moving forward in the case, there are a number of tools at the court's disposal to allow for protection of the identities of the members and partners who were quite concerned about disclosing their identities to the government, in part, because some of them are challenging the forced disclosure of pseudonymous social media handles. So to identify themselves in the context of a challenge to the government would defeat the challenge. If I could follow up on Judge Walker's question, focusing on redressability. Yes, Your Honor. You do have evidence that people stopped using social media because of this rule, but there isn't evidence that they would start using it again if the rule were vacated. And it seems to me that if there's still a risk that they can be asked about their social media activity by the consular officer in an interview, it has the same chilling effect. So how does vacature of this rule redress that chilling effect? Thank you, Your Honor. Again, in speaking to plaintiffs' members and partners, it was really the forced upfront disclosure of this information that resulted in the chill that they alleged in the complaint. But I would point the court to two cases that I think are instructive here. One is Department of Commerce versus New York that the court in Murphy cited in an extensive footnote. And another is Americans for Prosperity Foundation versus Bonta, where the Supreme Court concluded that a disclosure, a government disclosure requirement at the outset has what it termed basically an inevitable chilling effect on speech and association. And that the invalidation, in that case, the facial invalidation of that disclosure requirement would be sufficient relief to the plaintiff organizations and their members in that case. But in the facts of this case, though, there's the continued chilling effect of the fact that the consular officer can still ask you the exact same question. Yes. And I think that actually was probably the case in Americans for Prosperity versus Bonta as well. The court acknowledged that the state of California could conduct its own investigations into the propriety of the charitable organization's, you know, relationships with its donors. But in any event, here- I think it's a little bit more direct, though, because if you apply for a visa, you have to have that interview. So it's not just kind of, will the government focus on me in an investigation, which is a lot more amorphous. Whereas here, there's always going to be individual scrutiny of each applicant. And the question is just this particular question, can it be asked in a dragged-up fashion, as you say, or it can always be asked on an individual basis. And from the perspective of somebody who's applying, I feel like you're chilled either way. I respectfully disagree, Your Honor. I think that the absolute guarantee that you will be forced to disclose your social media handles to the government up front in the application process stands in stark contrast to the mere possibility that a consular officer who's quite busy with a demand that information in your case, particularly given that it might very well not be at all relevant to the adjudication of your visa there. So shouldn't you have had evidence affidavit something of somebody saying that if you vacate this role, I will start speaking on social media again? We would be happy to provide that evidence going forward, Your Honor. Again, subject to appropriate protective orders, et cetera. We would love the opportunity to allow this case to proceed further in the litigation. Assuming that that's not an option, that you just get a second bite at the apple at proving standing. Already had a chance. One other thing I would note is that we did request to the district court the opportunity to amend our complaint if the district court considered it insufficiently specific to substantiate our standing. But the district court concluded that that would have been futile because the court concluded that the disclosure requirement at issue here is not subject to any review whatsoever under the APA and subject only to the most deferential review under the First Amendment. You don't specifically state in your complaint that if the policy were ceased, that people would go back into social media with their partners, members, et cetera, and seek that information. Your Honor, we don't specifically state that, but I think that's a reasonable inference from the allegations we do make in the complaint, which include numerous statements that it is specifically because of this disclosure requirement that plaintiffs, members, and partners have stopped speaking on social media. And I'd like to take this opportunity, if I may, to emphasize that plaintiffs have three separate theories of standing in this case. One is based on the informational injury that the district court concluded sufficed for standing here, which really ties to the chilling effect on plaintiffs, members, and partners on social media. We do have two other separate theories of standing. Another is... Before you get to those, though, let's talk about, because it is dealing with informational injury, how do we square the Supreme Court case Aikens and Alliance for Hippocratic Medicine with PETA, you know, for our district? Because you have one, at least at the Supreme Court level, suggesting that there's a legal requirement to the information versus you rely on the information, which is what our cases are talking about. And I'm just trying to square those two together. Thank you, Your Honor. Yes, the cases that were referenced in the FDA versus Alliance for Hippocratic Medicine decision are cases in which the plaintiff organizations are seeking information from the government specifically. And so in those cases, the court is concerned about the concreteness and particularity of the injury alleged by plaintiffs. And so the court has required plaintiffs to show a statutory right, in some instances, to the information sought. Here, in contrast, I would argue that our case is much more aligned with Havens Realty Corporation and another case out of this circuit, Action Alliance for Senior Citizens of Greater Philadelphia versus Heckler. But I guess what I'm asking is, are those cases in conflict, are precedent with the Supreme Court? No, Your Honor. They're consistent with the Supreme Court's decision in Havens Realty Corporation, which the court and FDA acknowledged was still good law. And in that case, the plaintiff organization suffered an injury to its pre-existing mission-critical activities, which were counseling home seekers. And it was the challenged action by an apartment complex there that had really kind of polluted the flow of information to the organization. And that gave rise to a sufficiently concrete and particularized injury to support standing. So you're only suggesting that you just have to show that you rely on the information. You don't have to have a legal right to it. That's right, Your Honor. We believe that the government- There was a legal right to it, Havens. So the plaintiffs in that case argued that the information that the apartment complex had provided was counter to law, so that the apartment complex had engaged in racial steering. We're in the first amendment in requiring the disclosure of social media handles and that that has concretely, has very specifically disrupted the flow of information from plaintiff's members and partners. In your case, the information in question is information that a third party can choose to post or could choose to not post, right? Yes, Your Honor. And in Havens, the information was information that Havens was legally required to state truth, correct? They had to state it truthfully, yes. I mean, to the extent they were requested. You don't have to take my word for it. We said it, Hippocratic Medicine has said it, but in Havens, there is a legal right to the information. The plaintiffs had a legal right to the information in question. To non-lies. A statutory right. Yeah, to non-lies, to non-racist lies. Yes. And here, the plaintiffs do not have a legal right to the posts of third party social media users, correct? Well, what we're arguing is that they have a legal right to receive information that those users would have been providing, but for. What statute gives you a right to the person of an unknown gender in the Midwest and his posts or her posts on social media? Let's call this person John Doe. What statute gives your clients a legal right to John Doe's Facebook, to John Doe choosing to make Facebook posts? So again, I can see that there's no legal right to have this information provided to the plaintiff organizations, but there is a legal right not to have the government disrupt the flow of information as we've alleged under the First Amendment and the APA here. And then I would also point the court to the Action Alliance of Senior Citizens of Greater Philadelphia versus Heckler case, where the issue there was the Action Alliance had challenged HHS regulations that in some instances had required the beneficiaries of federal funding to provide certain information to HHS for approval of that funding. And then with respect to HHS specifically, so that was a government wide regulation with respect to HHS specifically, it stopped requiring those private parties, the recipients of federal funding to provide the same information. Action Alliance didn't allege any preexisting legal right to information about the ages of receiving services from those funded organizations. But nonetheless, the court concluded that they had standing to challenge the difference in those regulations that HHS had promulgated. I take that point and your opposing counsel can respond on that case if they wish. I want to just read you something that Hippocratic Medicine said. Oh, I know. Your statement that there's a difference between a case where you're seeking information the government provides, that's your informational right, versus here where you're seeking information that a third party provides, and that's your informational right. It seems like that might cut against you because there, in both cases, I guess you'd sue the government. But when it's the government's information, that's a more direct injury to you. Here, it's a more indirect injury to you because you're suing the government, but it's not even the government's information. So I think perhaps this question gets to Judge Pan's question about traceability and redressability. And there, what I would say is that the standard, first of all, is whether or not the injury is likely traceable to the government's action. Again, here we have very specific allegations that it is because of the government's action that plaintiffs have been chilled. And again, I would point to Americans for Prosperity v. Bonta and the Department of Commerce case supporting the likelihood that the government action caused the injury, even though third parties are the more kind of immediate actor in that situation. And I do think that you are correct that at least until recent Supreme Court cases, in the D.C. Circuit, you could get standing through an informational injury, even if you didn't have a statutory right to the information. PETA says that. But after PETA comes, among other cases, Hippocratic Medicine. And Hippocratic Medicine says the associations have not claimed an informational injury. And in any event, the associations have not suggested that federal law requires FDA to disseminate such information upon request by members of the public. I just can't imagine why that line would have been in the opinion if the court didn't believe that in order to assert an informational injury, you need federal law to require the dissemination of that information to the plaintiffs. So, Your Honor, again, in that case, the plaintiff organizations were alleged. I think actually it was the government on behalf of the plaintiffs were alleging an informational injury because I'm sorry, I'm confusing that with a different case. Quite the opposite. Yes. A lot of cases. And I apologize. They don't all match up. But there, the plaintiff organizations were alleging that they suffered an injury because FDA was no longer providing the same kind of information that they previously had. So, again, the organizations were claiming information, an injury stemming from lack of information from the government. And we, again, contrast that here. So, putting aside the point that in the court's own terms, that paragraph is effectively dicta, we think that's a different line of cases where the plaintiffs are requesting government information. And the concern in these cases is really whether or not there's a sufficiently particularized injury as the court has held. Plaintiff organizations or plaintiffs in general need a personal stake in the litigation. And here we've explained at great length in our complaint the personal stake that these organizations have in receiving this kind of information from their members and partners on social media. I get that the information is useful, maybe very important to the plaintiffs. I think they don't have a federal right to it. Let me also ask about this line from Same Case Hippocratic Medicine. It says, according to the medical associations, FDA has impaired their ability to provide services and achieve their organizational missions. Sounds a lot like your theory. Then the next line is, that argument does not work to demonstrate standing. So, what are you asserting for standing that goes beyond the government has impaired your ability to provide services and achieve your organizational missions? Within the context of our informational injury argument, and I want to emphasize again that we have another organizational standing theory relying on constitutional injuries. And in addition to that, plaintiff IDA has associational standing based on the injuries suffered by its particular members. But staying within the context of the informational injury theory here, the allegations that those organizations were putting forward were much more amorphous than the allegations here. For example, Dock Society hosts what it calls the Dock Impact High Five Awards that are supposed to celebrate documentary films, in part for their social impact. And Dock Society specifically measures social impact by looking at social media engagement, among other things. That relies crucially on information that its members and partners from around the world are providing on social media. And IDA has discovered cases of filmmaker censorship in countries around the world and then gone to great pains to investigate those cases, provide resources to those filmmakers, develop programming at its getting real conferences in the United States, tethered to the information that its filmmakers are providing again on social media that enable it to provide the services that they provide to its broader community. Can you give us a concrete example of speech that was chilled because of this rule and how you would have used that speech? Yes, we've identified a number of individuals who say that because of the disclosure requirement, they have stopped speaking on social media or have gone back and reviewed. I'm just trying to understand what is the injury to your clients because I see a lot of evidence that they're chilled. But then how would you have used the speech that they have just decided not to make? Yes, Your Honor. So the speech, let me just point you to a few paragraphs in our complaint. Actually, it's not in the complaint. I want a concrete example. For example, John Doe, he normally would say, I don't know, I support Donald Trump. And now he's not saying it. How would you abuse that? I'd want an actual concrete example of how this works. How does your organization use the speech that is chilled? So, for example, there are I think it was IDA members in that instance who are providing information about being chilled in countries where they're working, or sorry, being censored by governments in countries where they're working. They would normally have said that on social media. I'm being censored. I'm just trying to, please, concrete example. Yes, they have said that on social media. They're being chilled in foreign countries? Yes. So that means they're not being chilled by our country. Sorry, let me connect the dots here. So in those cases, there are filmmakers in other countries who are facing censorship by the governments in the countries where they're working or where they live. They have in the past noted that on social media. And that information has been gone to IDA where it can develop resources and programming, et cetera, to support its community of filmmakers and to alert other filmmakers that they might face those threats. It is in countries around the world where filmmakers like IDA's face threat of persecution, et cetera, where they might be particularly likely to use pseudonymous social media accounts. But because they're now forced to disclose their identities to the U.S. government. But those people would have to know that they're going to seek visas in the future. Yes. And we have identified individuals who plan to seek visas or who have already sought visas in the United States who, because of the disclosure requirement, have stopped speaking on social media. What speech did they self-censor? In our complaint, we identify many posts that relate to political speech. So speech about government policies and let's see. Sorry, I'm just trying to be specific here for you. And, you know, another. Director, I think the issue is you have to show concrete, immediate, particularized injury to your client. And I feel like what's in your complaint and in this record is really kind of amorphous. Oh, we use social media to do stuff. And I don't know that you've met that burden of showing that it's concrete and particularized, because I think it you would. I think the law requires you to say this speech is chilled. We would have used it in this way. And that is important to our mission or our thing. I don't see those dots being connected. Thank you. I mean, again, we think of the motion to dismiss stage. We have sufficiently alleged those injuries. But I do, again, want to emphasize that we have two other separate theories of standing. One is based on the plaintiff organizations hosting of events in the United States. These are their bread and butter activities. They their very missions are to bring filmmakers from around the world together at conferences and screenings and award ceremonies, et cetera, in the United States to support that community. And we've, you know, for example, Doc Society's good pitch events. Can you walk us through what the analysis is for those people? Because now they're not applying. Like, I mean, I understand what is the injury to you? Yes, exactly. We've identified a number of individuals who are now deciding not to apply for U.S. visas to come to the United States because they fear that their social media information will be swept up into government databases and then potentially shared with any untold number of governments through pre-existing information sharing agreements or simply used in a way that might delay future. I'm sorry, that's a separate category, but individuals who are no longer willing to come to the United States specifically because of the disclosure requirement and the burden that it places on them and their speech online. So rather than being chilled in their speech, they're being deterred from traveling to the United States and attending events at plaintiff organizations that plaintiff organizations are hosting here that without these events and without the participation of their international... Are they sort of very specific people that you're pointing to here? Because then we're more like in Mandela land, like you have invited them, they can't come because of this. Or are you just saying just broadly, there are people who are not coming and they could have come to our events. We've identified individuals who have decided not to accept future work here, despite significant past work, who would have sought visas to come to the United States. A Turkish IDA member who is currently working on a project with U.S. partners. Are we still talking about organizational standing or now are we associational? So still organizational standing because these people are not coming to the United States and as a result, the plaintiff organizations events are suffering a loss of participation that goes to their very reason for existence. So they would have come to the events. They were going to come for the events and now they're not applying for visas for your events. They're not applying for visas to come to the United States at all. But again, isn't that a little bit amorphous? They're not here. And if they were here, maybe they would have come to our events. Is that what you're saying? Yes, but we do also identify an individual who no longer is willing to participate in screenings and question and answer sessions because his comments may be mischaracterized by others and shared on social media. And then those are your screenings. I mean, I just it has to be your client's injury. And I hear a lot of injury, but I'm I'm having trouble kind of homing in on how it affects your clients. Your client has to have immediate, concrete, particularizing. Yes, Your Honor. And we think that these allegations and the reasonable inferences drawn from them under the motion to dismiss standards support the connection between these members and partners who are deciding not to come to the United States and the result that they will not be attending plaintiff's events here. But I do want to put forward our third theory of standing as well, the associational injuries or sorry, the associational standing that IDA has based on the injuries suffered by its specific members. And I think the district court's analysis later on in its opinion is instructive here where the district court concluded that plaintiff IDA had raised valid First Amendment claims in part based on its members who are currently in the United States and so who have kind of the full scope of First Amendment protections who are being presently chilled by the knowledge that they will have to apply for visas to, you know, to renew their visas or apply for new visas to remain in the United States and continue their lives and work here. And I'll just point you to the specific pages of the district court opinion that unpack this I think quite helpfully. The district court analysis at JA 361 to 364 gives a full explanation that we endorse as supporting our associational standing for IDA specifically because it's a And I would note again that if the court concludes that there is specificity lacking in the complaint, we would very much welcome an opportunity to amend the complaint and provide that specificity. Would you have had to have requested to amend the complaint on the grounds? For example, if we think that you have not demonstrated redressability, which goes to all of your claims, in order for you to get a second bite at the apple, would it be required for you to have sought to amend your complaint to address redressability in the court below? I don't think that level of specificity is required. We did ask the district court for leave to amend the complaint if the court ruled in the government's favor. And the district court concluded that it would have been futile to allow us for leave, to allow us leave to amend the complaint because of its legal conclusions that the disclosure requirements simply was not subject to review at all under the APA and subject to only very review under the First Amendment. And those are the two key conclusions that we challenge here, in part because we think that the sweeping implications of those conclusions are simply far beyond anything this court or the Supreme Court has endorsed to date. So if I may, I'll turn to those arguments, but I see my time has expired. So I want to ask one or two more standing questions, and then I'll ask my colleagues if they have questions on the merits, and then it'll be up to them whether we go into the merits. This, Judge Pan just mentioned that if redressability is a problem for you based on the theory that you and I began talking about, that would mean you have no standing for anything, correct? Yes, Your Honor, but I think the redressability concern is pretty squarely answered in the Americans for Prosperity de Bonta case where the court said, you know, not terribly dissimilar from the one here, was facially invalid and reached the full merits of that determination, in part because invalidating the disclosure requirement would have addressed the chill that the plaintiff charitable organizations were complaining of, even though their donors could have been swept up in individual investigations into those charities' activities in the future, notwithstanding. Here, it's possible that an order in your favor would, and I'm going to quote some language the district court quoted from non-binding authorities, but an order in your favor would remove an impediment to the desired behavior. It would make the desired behavior far easier. It would make for better odds that the desired conjecture that even though consular officers can still demand social media profiles, these people will host the things to social media that they have stopped hosting because of the challenged government. Your Honor, we have alleged that but for the disclosure requirement, plaintiffs' members and partners would continue speaking on social media as they had. That has to be a plausible allegation. Yes, and we think it's entirely plausible, particularly in light of the Supreme Court's many decisions about the chilling effects of government disclosure requirement. Again, as the Court and Americans for Prosperity Foundation termed it, that there's an inevitable chill. What's your best case for there are two government chilling policies. We're challenging one of them, and if we win on that one, we have a redressable injury, never mind that there's still a second government chilling policy. I think Bonta is exactly that case, Your Honor. I mean, the California AG's office could have always conducted its own investigation, and in fact, the Court looked to that possibility of conducting investigations. In this context, the government is going to investigate every single visa applicant. But is not, excuse me, Your Honor. Please go ahead. Sorry. There is no guarantee that this particular information will be requested because it's an additional just opportunity for a consular officer. And this goes to the point that consular officers, in terms of the evidence that has been put before the agency, don't view it that helpful. You're positing a weirdly sort of half risk averse, half risk welcoming, unknown visa applicant whose speech we don't exactly know what it's going to be. And this visa applicant is risk averse enough that they won't post because they're sure they have to turn over their social media profile. But they're risk welcoming enough that they will post, even though there's going to be an investigation of them when they apply for a visa. And that investigation might ask the very question that chilled them from posting in the first place. I think the difference could be a 1% possibility that that information is requested on an individualized basis and 100% guarantee that you're going to be forced to disclose it at the category that you're applying to. Unusual gambler. And you're assuming that they're all going to think it's a 1% possibility. But if you're worried that you have postings that would affect you or could be divulged to hostile governments, you're going to weigh that heavily. If I may clarify one thing, it's not that the members and partners are considering their social application. They're simply concerned about the likelihood that it will be reviewed, notwithstanding the fact that it's not relevant to their application and misconstrued by the government or even not misconstrued by the government, that they are allowed to enter the country, that it doesn't impact their visa application process whatsoever, but then it's stockpiled in government databases and potentially shared with threatening governments in the future. So again, the concern here isn't even necessarily that they would be denied on the basis of the media information that they're disclosing to the government under this requirement, but simply the harm that government disclosure requirements kind of inevitably have as in Shelton v. Tucker, Bonta, and many other cases dating back many decades. Ms. DeSalle, let me ask, do you have questions on the merits? No. I don't think we have any questions on the merits, but we do have your very excellent brief on the merits, and it will be considered. Thank you. Thank you. Mr. Brewer. May it please the Court, Simon Brewer for the government. The plaintiff organizations lack standing to bring this challenge. They are not directly regulated by the disclosure requirement that they challenge, so instead they rely on a series of attenuated harms purportedly arising from third parties' reactions to the disclosure requirement. But as recent Supreme Court decisions make clear, those purported harms do not support Article III's standing. Starting with the organizational injuries alleged, Alliance for Hippocratic Medicine clearly forecloses the diversion of resources theory expressed by plaintiffs. That leaves only their theory of informational injury, which itself is also foreclosed. You believe the plaintiffs have to have a legal right or entitlement to the information. They can't just rely on it. That is what the Supreme Court said in Alliance for Hippocratic Medicine in that sentence read by Judge Walker earlier. And how does that square with D.C. Circuit precedent? To the extent prior D.C. Circuit cases came to an opposite conclusion, they have been abrogated by the Supreme Court's holding. Was it a holding? I think it was, Your Honor. They said the Supreme Court said that the plaintiffs hadn't alleged such a theory, but then even if they had, it would still be foreclosed under the Supreme Court's case law. So if we were to go with you, is there any clean-up in our case law? I think what your honors could say is that to the extent that prior D.C. Circuit precedent left open the possibility or perhaps even endorsed the idea that a statutory entitlement to information was not required, following Alliance for Hippocratic Medicine, that is no longer good law. Turning to their First Amendment harms, Murthy makes clear that they can't rely on this listener theory of standing either. As an initial matter, it relies on speculation about causation and redressability, as the panel's question suggested earlier. These are speech posted online by third parties. Those third parties may choose to post or not to post for any number of reasons outside the disclosure requirement. And in addition, and Murthy makes clear that such speculation does not support an Article III injury. And plaintiffs also lack the kind of concrete and specific connection to the speakers that is required under the Supreme Court's case law to give rise to this listener theory of standing under the First Amendment. I'm turning to the associational theories, unless the court has any questions on the organizational theories. To have associational theory of standing, the plaintiff organizations would need to identify a specific member of plaintiff IDA who would have standing in their own right to press the challenge that is sought. And they clearly have failed to allege enough facts that would support such an associational theory of standing. There is one sentence in the complaint about a member of IDA who lives in the Midwest, who has purportedly reviewed some of their social media and deleted certain posts. There is nothing in the complaint about whether or not this person will be required to apply for a visa in the future, when that might be, kind of visa, and so forth that would allow an assessment of whether or not this actually inflicts a concrete and imminent injury on them, as opposed to being an independent decision made by this person, absent any sort of imminent injury or concrete fear. What about the traditionally manageable standard of review? Yes. So turning to the merits, assuming that one or more plaintiffs have standing, the statute does not provide any judicially manageable standard. And I think the key here is that the term necessary standing alone isn't the right way to look at this question. The statute directs the secretary to collect information necessary to, among other things, the enforcement of federal nationality and immigration law. And that provides no judicially manageable standard. If, for example, a statute directed the FBI in the course of its investigations to collect information it deems necessary to carry out its law enforcement and investigatory functions, we would not expect courts to be second-guessing its judgments about what kind of information is necessary for those investigations. And so, too, here, the State Department has been tasked with investigating and enforcing immigration and nationality laws. And it has made a reasoned judgment that this type of information contributes to that investigation. Can you talk about redressability? Yes, Judge Pan. So to Your Honor's question from earlier, there's a real redressability problem here because the plaintiffs have conceded that consular officials can collect this information as part of individual visa applications. And Murthy indicates in that kind of scenario redressability is lacking because the plaintiffs had similar incentives to moderate their own content posted on social media. So whether or not the visa collection policy, excuse me, the information collection policy challenge here remains as part of the visa application, visa applicants have similar incentives to consider what they're posting on social media and knowing that public posts could be reviewed as part of the visa application process. And as a procedural matter, there was a motion to in the court below that was denied. Is this something that we can just decide in the first instance or should it be remanded? Standing is, of course, something that the court can decide in the first instance. And in fact, the court has an obligation to address jurisdictional issues, of course. But I guess the question is, is there any way that they could provide more evidence that would support standing? So I think the fundamental standing defects here are multiple and I'm specifically focusing on redressability because presumably they could get an affidavit from somebody that says, if the rule is vacated, I will post again, even though there is this chance that the consular official will ask me the same question here. One would think that if that such a person were willing to say that it would have been concerned that plaintiffs might be able to come up with such a person. I think that speaks to the fact that there are other independent grounds why standing is lacking here. And so a ruling on those would clearly foreclose. Well, I'm just focusing on redressability. If we think that that's the problem, does that need to be a remand? Or do you think that there's nothing they could do to amend their complaint to address that redressability problem? I think if plaintiffs were able to come up with such a person, it would have been included in the instance. And there's some language in, I think it's Murthy, that what they, because they're seeking a perspective, you know, relief. They'd have to not only show that, well, they have to show that going forward, that person is, would post something, but will not post something absent of relief. That's easiest to support by showing that it's happened in the past, that same person has been chilled in the past. I guess they wouldn't have to show that the person had been chilled in the past, but what do you think? That's right. The essential question for perspective relief is what is going to happen in the future? Is there some kind of imminent or ongoing injury? Really hard to show that if it hasn't happened in the past. Right. And that's exactly right. And so one of the difficulties faced in Murthy by the plaintiffs was this inability to show past injury with respect to traceability and causation. And so that, of course, will make it more difficult, but ultimately for perspective relief, the question is about the future. I'd be glad to answer any other questions the panel has. I think we have your argument. We urge you to affirm. Thank you. Mr. Brewer. Ms. Distel. Thank you, Your Honor. I'd like to just make two points on redressability to address the court's concerns. So first, with respect to the kind of probability question, we think there's a significant difference between a guarantee that you will be run over while multi-lane highway and the possibility that you will be run over if you cross a crosswalk at a red light. We think that's the difference between the dragnet boil the ocean approach to collecting social media information that the government has taken here and the individualized application specific approach that consular officers are allowed to pursue under pre-existing authority. Second, the Supreme Court in the Department of Commerce case did address a situation we think that goes even beyond the situation here, where the party states were concerned that the addition of a citizenship question to the census would result in fewer people completing the census. And the Supreme Court held and the court in Murphy cited this decision at length in a footnote that third parties will likely react in predictable ways to the citizenship question, even if they do so unlawfully because they're required to complete the citizenship application and despite the requirement that the government keep individual answers confidential. So there, and I'm quoting from this case, the court held that respondents theory of standing does not rest on mere speculation about the decisions of third parties. It relies instead on the predictable effect of government action on the decisions of third parties. And that's what we've alleged here as well. No further questions. I think that's helpful. And I think your metaphor about the road is extremely helpful. I'm not sure if I'm persuaded, but that was very strong. I appreciate it. Thank you for your time. Thank you very much.
judges: Walker; Childs; Pan